IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
D.J.'s DIAMOND IMPORTS, LLC   *
et al.                        *
                              *
v.                            *
                              *   Civil Action No. WMN-11-2027
SILVERMAN CONSULTANTS, LLC    *
et al.                        *
                              *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**MEMORANDUM**

Before the Court is Defendants' Motion for Summary Judgment, ECF No. 73, and Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 75. The motions are fully briefed. Upon a review of the papers and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that both motions will be denied.

**I. FACTUAL AND PROCEDURAL BACKGROUND**[1]

Plaintiff Yaacov Dassa is the owner of Plaintiff D.J.'s Diamond Imports, LLC (D.J.'s Diamonds), which is a wholesaler of diamonds, metals, and jewelry. Plaintiffs initially brought this suit against two sets of defendants: Jack Brown and his two companies that were engaged in the retail jewelry business (the Brown Defendants); and Silverman Consultants, LLC (Silverman), its president, Robert Epstein, and one of its field supervisors,

---

[1] A more detailed factual background is presented in this Court's January 18, 2012, Memorandum granting in part and denying in part a motion to dismiss. ECF No. 27.

1

Craig Allen (the Silverman Defendants). Silverman is a company that specializes in turning around jewelry businesses, selling off inventory, and liquidating entire stores.

On December 11, 2006, Dassa and Brown entered into a contract under which Dassa agreed to "finance the buying of all gold and precious metals, diamonds, watches etc. which come into [Brown's jewelry store] to be purchased from the public." Pls.' Ex. 7, 12/11/06 Contract ¶ 1. The contract also provided that the parties would "split the profit equally from all profits made from scraped [sic] and sold items purchased from the public," and that Brown would use half of his profits gained from the sold and/or scrapped items to reduce a significant debt that Brown owed to Dassa. Id. ¶¶ 2, 3. Dassa represents that the business that he conducted in Brown's store under the contract was very lucrative and was the primary source of his income. Pls.' Ex. 11, Dassa Aff. ¶ 2. Brown also states that his business with Dassa was a profitable and lucrative part of his revenue and income. Pls.' Ex. 10, Brown Aff. ¶ 3.

Apparently, however, this arrangement was not lucrative enough for Brown. As of April 2010, Brown was in debt to the Internal Revenue Service, the State of Maryland, Provident Bank, and Dassa. To address this debt problem, Brown contracted with Silverman in April 2010 to conduct a "high impact promotional sale" of Brown's inventory. Pls.' Ex. 1, April 2010 Agreement

2

at 1.  In July 2010, Brown entered into a second agreement with Silverman, this time to conduct a "high impact promotional sale and Going Out of Business Sale."  Pls.' Ex. 2, July 2010 Agreement at 1.  These agreements also involved significant loans from Silverman to Brown, loans secured by Brown's inventory.  Defendant Craig Allen was the individual sent by Silverman to organize and conduct the sales.

Dassa testified that, shortly after Brown entered into the April 2010 Agreement, Allen began limiting his access to Brown's store and, except for "a couple of crumbs," Allen would not permit Dassa to use the store to make purchases from the public. Pls.' Ex. 6, Dassa Dep. at 62.  On one particular occasion, on June 15, 2010, there was a heated exchange between Dassa and Allen regarding Allen's limitation of Dassa's ability to carry on his business.  A witness to the exchange, Sam Bowerman, testified that it became "very, very heated" and both men exchanged profanities.  Pls.' Ex. 8, Bowerman Dep. at 117. While Bowerman opined that Allen had a "physically intimidating presence," id. at 119, his impression of the events was that Dassa, whom he knew to be a martial arts instructor, was encouraging Allen to hit him so that he would be able to retaliate.  Id. at 117-18.

Brown's store eventually closed in March 2011.  On April 15, 2011, Silverman sued Brown in the Circuit Court for

Baltimore County, Maryland for the failure to make payments under the April 2010 and July 2010 Agreements. Brown counterclaimed in that action. Dassa then filed this suit in this Court against Brown for the approximately $220,000 that he alleges is owed to him by Brown, and against the Silverman Defendants for claims related to their alleged interference with his business dealings with Brown. In response to a motion to dismiss filed by the Silverman Defendants asserting a lack of diversity jurisdiction, Dassa voluntarily dismissed the Brown Defendants who, like Dassa, are citizens of Maryland for purposes of diversity. In conjunction with the dismissal of the claims against the Brown Defendants, Dassa and Brown entered into a settlement agreement and release in which Brown assigned to Dassa any recovery Brown might obtain from the Silverman Defendants in the Baltimore County action. Defs.' Ex. C at 4.

On January 18, 2012, this Court issued a Memorandum and Order denying the Silverman Defendants' motion to dismiss for failure to join the just-dismissed Brown Defendants. In that Memorandum and Order, the Court also dismissed all the claims against the Silverman Defendants except Plaintiffs' tortious interference claims related to the December 11, 2006, contract. ECF No. 27 at 14-17. Noting that this contract was terminable at will, the Court held that, while there was a "broader right to interfere" with such a contract, "[a] plaintiff can still

bring a claim for intentional interference with a terminable at will contract if he can establish that the third party acted 'improperly or wrongfully.'" Id. at 16 (citing Macklin v. Logan, 639 A.2d 112, 121 (Md. 1994)).  The Court further noted that "[t]he conduct recognized by Maryland courts that can lead to liability in this context includes 'violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.'" Id. (quoting K & K Mgmt., Inc. v. Lee, 557 A.2d 965, 979 (Md. 1989)).  Because Plaintiffs had alleged that Allen employed threats of physical harm and intimidation to induce the breach of the December 11, 2006, Contract, the Court allowed Plaintiffs' tortious interference claim to survive "on that slim thread." Id. at 16-17.

After a brief stay of this litigation to permit settlement negotiations to go forward, the Silverman Defendants filed a second motion to dismiss in which they argued that D.J.'s Diamonds should be dismissed as a plaintiff because it was not a party to the December 11, 2006, Contract.  ECF No. 44.  In denying that motion, the Court further clarified that, because the contract at issue was one that was terminable at will, "a claim for interference with that contract is treated as a claim of intentional interference with economic relations."  ECF No.

72, June 11, 2013, Mem. & Order at 3. As such, D.J.'s Diamonds did not need to be a party to the original contract to bring an interference with economic relations claim. Id.

The Silverman Defendants now move for summary judgment on the ground that, because Silverman (and by extension Epstein and Allen) was made an agent of Brown pursuant to the April and July 2010 Agreements, the tortious interference claims fail as a matter of law given that the agent of an actor in an economic relationship cannot be found to have interfered with that relationship. In a related argument, they suggest that, as Brown's agent, Silverman was released from Plaintiffs' claim under the settlement agreement into which Brown and Dassa entered to settle the Baltimore County case. These Defendants also contend that, aside from the agency issue, Plaintiffs' claim lacks factual support as to any Defendant and that, more specifically, there is no basis for an individual claim against Epstein. In their cross-motion, Plaintiffs argue that the material facts are not in dispute and, under those undisputed facts, they are entitled to summary judgment in their favor.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

6

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. Id. at 249.

When both parties file motions for summary judgment, as here, the court applies the same standards of review. Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991); ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted). The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard." Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co., 627 F. Supp. 170, 172 (D. Md. 1985).

## III. DISCUSSION

Under Maryland law, a tortious interference with business or economic relation claim requires three actors: two parties who have a business relationship and a third party who interferes with that relationship. K & K Mgmt., Inc. v. Lee, 557 A.2d 965, 973 (Md. 1989). Thus, it is undisputed that such a claim cannot stand "if the actor who is interfering with the relationship is an agent of one of the actors in the relationship." McReady v. O'Malley, 804 F. Supp. 2d 427, 445 (D. Md. 2011). The reason for this rule is straightforward: if the defendant is an agent acting on the behalf of one of the parties in the relationship, it cannot be said that some outside third party has interfered with the relationship of the other two parties.

In arguing that they were Brown's agents, Defendants focus primarily on the fact that, in the April 2010 and July 2010 Agreements, Silverman was designated as Brown's "Agent." Whether or not an agency relationship exists, however, is not determined solely by the language that might have been used in some written agreement, but "is to be determined by the relations of the parties as they exist under agreements or acts, and the ultimate question is one of intention." Ramsburg v. Sykes, 158 A.2d 106, 108 (Md. 1960). In making that determination, Maryland courts have recognized three elements

8

that are integral to an agency relationship: (1) the agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal. Schear v. Motel Mgmt. Corp. of Am., 487 A.2d 1240, 1248 (Md. Ct. Spec. App. 1985). Furthermore, "the existence of an agency relationship is ordinarily a question of fact" which must be submitted to the jury if legally sufficient evidence of an agency relationship is produced. Green v. H & R Block, Inc., 735 A.2d 1039, 1048 (Md. 1999).

In opposing the Silverman Defendants' motion, Plaintiffs have pointed to several aspects of the Silverman/Brown relationship that undermine a finding that Silverman functioned as Brown's agent. First and foremost, Plaintiffs note that, while the April and July 2010 Agreements speak in terms of Silverman functioning as Brown's "Agent" for the purposes of conducting promotional and going out of business sales, they also created a lender/borrower relationship. This later relationship, under which Silverman ultimately took possession of Brown's assets, is somewhat at odds with the conclusion that Silverman was an agent of Brown.

Furthermore, other terms of the Agreements undermine the conclusion that Silverman was Brown's agent. The Agreements expressly provided that Silverman, not Brown, "will have the

9

right to make all final decisions regarding the operation of the Sale." April 2010 Agreement ¶ 16; July 2010 Agreement ¶ 18. The Agreements placed significant restrictions on what actions Brown could take "unless authorized by [Silverman]." April 2010 Agreement ¶ 13; July 2010 Agreement ¶ 15. Also, as the parties operated under the Agreements, there is serious question as to whether Silverman or Allen was ever subject to Brown's right of control and thus whether the first element of the test of an agency relationship is satisfied.

The Agreements and the parties' conduct under the Agreements give rise to significant issues of fact as to the other two elements as well. As to the second element, the security interest and default provisions in the Agreement undermine the conclusion that Silverman was acting primarily for the benefit of Brown. As to the third element, in Allen's deposition, he specifically denied that he had any authority over Brown's contractual relationships with others. Pls.' Ex 5, Allen Dep. at 45. In sum, the Court finds that there is a material dispute of fact as to whether Silverman and Allen functioned as agents of Brown. Were the Court to find that they were agents within the scope of the promotional and going out of business sales, there remains the additional question as to whether that agency extended to the business relationship of Brown with Dassa.

To prevent the Court from considering the evidence related to the character of the actual relationship between Silverman and Brown, the Silverman Defendants focus on the distinction between agency relationships created by written agreement and those created by inference. They suggest that "only '[i]f there is no written agency agreement,' [] does a court look for agency by inference by having to examine the three cited factors." ECF No. 76 at 4 (quoting Patten v. Board of Liquor, 667 A.2d 940, 947 (Md. Ct. Spec. App. 1995)). As Plaintiffs correctly observe, however, the word "only" before the Silverman Defendants' quotation of Patten was not part of the Court of Special Appeals' decision, but was inserted by the Silverman Defendants. Patten stands for the proposition that if there is no written agreement, the court looks to the three factors cited above. The court did not state or imply that the presence of a written agreement prohibits consideration of the actual relationship between the parties.

Considering the Agreements and the parties' conduct under those Agreements, the Court finds that there are genuine disputes of material fact rendering summary judgment inappropriate on the ground that Silverman was an agent of Brown and thus could not be deemed liable for interference with Dassa's economic relationship with Brown. Because the Silverman Defendants' "release" argument is also predicated on the

11

conclusion that Silverman was an agent of Brown, that argument is also the subject of material disputes of fact.

The Silverman Defendants' third argument, i.e., that the undisputed facts refute the conclusion that they induced Brown to breach his contract with Dassa, is also unavailing.  The Silverman Defendants unnecessarily narrow the scope of Plaintiffs' claim.  Noting that the December 11, 2006, Contract specifically referenced Dassa's financing of Brown's purchases, Defendants argue that Plaintiffs' allegation that they prohibited his access to the store "to conduct purchasing and selling" on his own behalf would not constitute interference with the contract.  ECF No. 73-1 at 9.  The economic relationship between Brown and Dassa, however, encompassed Dassa's purchasing and selling, and Allen and Silverman were aware of the scope of that relationship.

In a somewhat puzzling argument, the Silverman Defendants also argue that Plaintiffs cannot state a claim for interference with contract because Plaintiffs do not allege that they induced Brown to breach his contract with Dassa, but "assert[] only that Defendants 'refused to allow him [Dassa] to continue to perform services under the Contract' – not that Brown breached the Contract."  Id. (quoting Am. Compl. ¶ 15).  Inducing a breach, however, is not the only way to commit this tort.  Inference also encompasses preventing a party from performance under an

existing economic relationship.  Lake Shore Investors v. Rite Aid Corp., 509 A.2d 727, 732 (Md. Ct. Spec. App. 1986).

Finally, the Silverman Defendants suggest that the timing of various events undermines the validity of Plaintiffs' claims. Because Dassa testified that Allen told him that he was banned from buying gold in Brown's store a few days before the June 15, 2010 altercation, the Silverman Defendants argue that the altercation was irrelevant to Plaintiffs' claim.  ECF No. 73-1 at 10.  They also argue that because Allen was not shown a copy of Dassa's December 11, 2006, Contract with Brown until July or August, 2010, "it was impossible for the events of the altercation to bear any relationship to the Contract."  ECF No. 76 at 9.  These arguments also artificially narrow the scope of Plaintiffs' claim.  Plaintiffs suggest a course of intimidation of which the events of June 15 are only an exemplar and, while Allen may not have seen the contract until sometime after the confrontation, Plaintiffs provide some evidence that he was well aware of Dassa's business relationship with Brown.

Defendants' argument regarding the potential liability of Epstein, Silverman's president, has the same potential flaw. They submit an August 11, 2010, email from Allen to Epstein transmitting the Dassa/Brown contract, Defs.' Ex. I, and suggest that there is no evidence that Epstein was aware of the contract prior to that date.  Plaintiffs note that this email is

13

unauthenticated and is not in a category of evidence that is self-authenticating.  Also, there is testimony in the record that Allen and Epstein communicated on a daily basis concerning events at the store.  Bowerman Dep. at 175.

The Court will deny Defendants' motion for summary judgment.  The Court will also deny Plaintiffs' cross-motion.  To meet their acknowledged burden of establishing that Defendants interfered "'by conduct that is independently wrongful or unlawful,'" ECF No. 75-1 (quoting Jordan v. Alternative Res. Corp., 453 F.3d 332, 348 (4th Cir. 2006), Plaintiffs proffer that it is undisputed that Dassa was denied access to the store by "threat of imminent bodily harm," in that Allen "explicitly threatened that he would 'break [Dassa's] legs." Id. (quoting Allen Dep. at 90).  As noted above, however, there is at least some dispute as to which party was the aggressor in the events of June 15th.  In his discovery responses, Allen explains that the threat to break Dassa's leg came only after Dassa started an argument with him and struck him in the face.  Allen responded that, if Dassa hit him again, he would break his legs.  According to Bowerman, it was Dassa who continued to provoke the confrontation.  Bowerman Dep. at 117-18.

At the motion to dismiss stage, the Court opined that Plaintiffs' claim survived on a slim thread.  That thread is

perhaps slimmer at this stage of the proceedings, but there remain sufficient disputes of fact that neither side is entitled to judgment.  A separate order consistent with this memorandum will be issued.

                                            _____/s/_____

                                              William M. Nickerson
                                              Senior United States District Judge

DATED: November 21, 2013.